BAUER, Chief Judge.
Brian Vukadinovich appeals from the district court’s grant of summary judgment in favor of the defendant Board of School Trustees of the Michigan City Area Schools (the “Board”), and individual defendants Clyde Zeek, Nathaniel Clay, Allan Whitlow, Diane Dibkey, Greg Hanke, and Carmelo Gentile. Vukadinovich sued the Board and other defendants under 42 U.S.C. § 1983 claiming that the circumstances surrounding the termination of his employment as a teacher for the Michigan City Area Schools (“M.C.A.S.”) violated the United States Constitution. On appeal, Vukadinovich raises a variety of claims. Initially, he contends that the defendants violated his right to freedom of speech under the First Amendment as incorporated by the Fourteenth Amendment. Next, Vukadinovich claims that the defendants violated his rights to procedural due process and equal protection of the laws guaranteed him by the Fourteenth Amendment. Finally, he alleges pendent state law claims for breach of contract, defamation, and slander. Because we find no merit in any of Vukadino-vich’s claims, we affirm.
I. FACTS
From 1983 until 1988, Brian Vukadino-vich worked in the M.C.A.S. system, initially as a part-time teacher, then as a full-time teacher. He taught at Barker Junior *406 High, Krueger Junior High, Elston High School, and, lastly, at Rogers High School. He also volunteered as an assistant basketball coach at Rogers. Appellant’s Brief at 2-3.
On February 12, 1986, Vukadinovich appeared at a regular meeting of the Board and publicly criticized the Board for hiring Clyde Zeek as Superintendent of the M.C.A.S. Shortly after the meeting, Zeek approached him and requested a meeting in Zeek’s office for the following Monday. Zeek told Vukadinovich that he did not think it was “appropriate for [Vukadino-vich] to be appearing before the School Board and saying things that you shouldn’t be saying in public.” Appellant’s Appendix at 19. Zeek also told Vukadinovich that “it was a big mistake for [Vukadinovich] to appear before the Board in public, to criticize him and things that were going on under his leadership and direction, and [that Vukadinovich] would be making a mistake if [he] continued to do that.” Id. at 20.
Following his criticism of Superintendent Zeek and the Board, Vukadinovich continued working as a teacher for the M.C.A.S. Eventually, Assistant Superintendent Allan Whitlow recommended that Vukadinovich be made a full-time teacher. Zeek approved the recommendation and, in August of 1987, the Board awarded Vukadinovich a full-time teaching contract.
The year before, however, a series of legal problems had begun to plague Vuka-dinovich. On May 21, 1986, a jury in the Circuit Court of LaPorte County, Indiana, found Vukadinovich guilty of driving while intoxicated and of public intoxication. Vu-kadinovich received a sentence of 365 days in jail,' with all but 30 days suspended. His conviction was affirmed on appeal. Appel-lees’ Brief at 5. Vukadinovich was incarcerated in the LaPorte County jail from December 21, 1987 until January 19, 1988. As a result of the incarceration, he missed eleven days of work.
Vukadinovich’s troubles did not end there. On June 5, 1987, while the appeal of the LaPorte County conviction was pending, he was convicted in the Circuit Court of Jasper County, Indiana, of resisting law enforcement and of operating a motor vehicle without a valid license. He received a sentence of one year in jail. Again, the court suspended all except 30 days of his sentence (to be served on weekends), but put Vukadinovich on probation for the rest of the year.[1]
On December 21, 1987, after Zeek and Whitlow learned of Vukadinovich’s incarceration for his first conviction, they met to discuss Vukadinovich’s future with the M.C.A.S. On January 8, 1988, pursuant to Indiana Code § 20-6.1-4-11, Zeek sent Vu-kadinovich a certified letter which notified Vukadinovich that on February 9, 1988, the Board would consider canceling Vukadino-vich’s employment contract. The letter set out the procedures to be followed and informed Vukadinovich of his right to request a hearing before the Board. The letter further provided the reasons why the Board was considering canceling Vukadino-vich’s contract. It listed the following reasons: “immorality (based upon the conviction of violation of criminal laws resulting in an interference with the educational purposes); neglect of duty; other good and just cause.” Appellees’ Brief at 7.
Vukadinovich formally requested a hearing before the Board, a statement of the reasons for the consideration of cancellation, and a list of witnesses to be called and documents to be offered by the Board at the hearing. The Board, by letter dated February 4, 1988, notified Vukadinovich of the date, time, and place for the hearing. Appellant’s Appendix at 25. By two separate letters, both dated February 8, 1988, Vukadinovich informed Zeek that he (Vuka-dinovich) would be represented in the matter by the Indiana State Teachers’ Association and the Michigan City Education Association in the person of Robert Rosinski. *407 Prior to the hearing, Vukadinovich appeared at Superintendent Zeek’s office and asked that he be allowed to inspect his personnel file. Vukadinovich examined his file and found that it contained nothing out of the ordinary. Appellant’s Brief at 5.
The Board convened for the hearing on March 5, 1988. Attorney Marsha Volk, who was also the Board’s private attorney, presided over the hearing. Volk presided without objection and made rulings concerning the admissibility of evidence. She did not act as a prosecutor for the school administration. Rick Small, counsel for the administration, filled that role. Also, Volk did not participate in the Board’s deliberations. During the hearing, both the school administration and Vukadinovich were allowed to present evidence, including the testimony of witnesses, to cross-examine witnesses presented by the other party, and to argue their respective positions to the Board.
Several witnesses testified at the hearing. One witness, Janine Hooley (a Drug Free Coordinator for substance and alcohol abuse), testified about Vukadinovich’s alleged alcoholism. Board member Greg Hanke also testified that Vukadinovich had a problem with alcohol. Hooley and other witnesses asserted that other teachers and employees had similar problems with alcohol.
At the March 5, 1988 hearing, Vukadino-vich did not allege that the proposed cancellation of his employment contract was in retaliation for his criticism of the Board and Superintendent Zeek in February of 1986. At least two Board members, Greg Hanke and Karen Janus, were not members of the Board in 1986. Hanke stated in his deposition that he had no knowledge of Vukadinovich’s 1986 comments. He also stated that the Board never discussed Vu-kadinovich’s 1986 comments.
On March 22, 1988, the Board voted to terminate Vukadinovich’s employment for “immorality, neglect of duty, best interests of the School Corporation, and other good and just cause.” Appellees’ Brief at 14. The Board sent Vukadinovich a letter that notified him of their decision. On June 14, 1988, the Board sent Vukadinovich another letter informing him that the Board approved his submission óf his discharge grievance to arbitration. Appellant’s Appendix at 115. Vukadinovich submitted his grievance to arbitration and the arbitrator determined that the Board should reinstate him. The Board then filed suit in an Indiana state court challenging the validity of the employment contract’s arbitration provision as it related to the cancellation of a teacher’s contract. The Indiana court entered summary judgment in favor of the Board. On September 18, 1991, an Indiana appellate court affirmed the decision. Michigan City Educ. Assoc. v. Board of School Trustees, 577 N.E.2d 1004 (Ind.App.1991).
After the Board discharged Vukadino-vich, some Board members made derogatory comments about him. Defendants Diane Dibkey and Assistant Superintendent Whitlow described Vukadinovich to local newspaper reporters as “immoral.” Appellant’s Appendix at 128-137. Also, Superintendent Zeek criticized Vukadinovich before a group of public school administrators. Appellant’s Brief at 10;
In February of 1989, defendant Carmelo Gentile, the principal of Rogers High School, discovered that Vukadinovich was frequently on school grounds and was still volunteering as an assistant basketball coach. Gentile also found that a student had been given a copy of the arbitrator’s award. On February 24, 1989, Gentile called Vukadinovich at home and told him to stay away from Rogers High School. Gentile also demanded that Vukadinovich stop talking to local newspapers about the case. Finally, Gentile ordered Earl Cunningham, a Rogers High School teacher, to report to Gentile any time he saw Vukadi-novich on the school grounds.
Vukadinovich sued the Board, Superintendent Zeek, Zeek’s successor Nathaniel Clay, Assistant Superintendent Whitlow, Principal Gentile, and Board members Dib-key and Hanke for alleged constitutional violations under 42 U.S.C. § 1983. On September 24, 1991, the district court granted summary judgment in favor of all defen *408 dants and against Vukadinovich on his federal claims. The district court also dismissed Vukadinovich’s state law claims for lack of subject matter jurisdiction. Vuka-dinovich v. Board of School Trustees, 776 F.Supp. 1325 (N.D.Ind.1991). Vukadino-vich appeals.
II. ANALYSIS
We review a district court’s grant of summary judgment de novo. Scherer v. Rockwell Int’l, 975 F.2d 356 (7th Cir. Sept. 16, 1992). We accept all facts and inferences in the light most favorable to the non-moving party. Forbes v. Trigg, 976 F.2d 308 (7th Cir.1992); Pardo v. Hosier, 946 F.2d 1278, 1280 (7th Cir.1991). Summary judgment is proper where “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c).
A. Vukadinovich’s First Amendment Claims
Plaintiff-appellant Vukadinovich claims that the defendants violated his First Amendment rights when they terminated his employment contract. He contends that this action by the Board was a retaliatory measure taken against him because of his criticism of the Board’s decision to hire Zeek. Vukadinovich also alleges that Principal Carmelo Gentile violated his First Amendment rights by demanding that he stay away from Rogers High School. We disagree and conclude that none of the defendants violated Vukadinovich’s First Amendment rights.
(i) First Amendment Retaliatory Discharge Claim
It is well established that the government may not discharge an employee for reasons that infringe upon that employee’s constitutionally protected interest in freedom of speech. See Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); Perry v. Sin-dermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). In order to recover for such a discharge, a public employee must show (1) that the speech engaged in by the employee was constitutionally protected and (2) that the defendants retaliated against plaintiff because of that speech. Caldwell v. City of Elwood, 959 F.2d 670, 672 (7th Cir.1992); Barkoo v. Melby, 901 F.2d 613, 617 (7th Cir.1990).
Here, even if Vukadinovich’s criticism of the Board and Superintendent Zeek is constitutionally protected speech, his speech was not a substantial or motivating factor in the actions of the appellees. In fact, Vukadinovich has not even demonstrated that his 1986 criticism was any factor at all in the Board’s 1988 decision to terminate his employment contract.
First, Vukadinovich himself did not assert any link between his 1986 comments and his discharge until more than two years later — despite repeated opportunities to do so — in fact, until he filed this lawsuit. During the hearing before the Board, Vukadinovich never suggested, or even hinted, that the Board might have been motivated by his 1986 comments. More significantly, the Board twice renewed Vukadinovich’s contract (for the 1986-87 and 1987-88 school years), and even upgraded his status to full-time, after he had criticized the Board's decision to hire Zeek. Given these undisputed facts, we agree with the district court’s conclusion that no reasonable jury could conclude that Vukadinovich’s 1986 comments were a substantial or motivating factor (or, for that matter, any factor at all) in the Board’s decision to terminate Vukadinovich’s employment contract. [2]
*409 (ii) Post-Discharge First Amendment Claim
Almost a year after the Board fired him, in February of 1989, Principal Gentile discovered that Vukadinovich was often on the grounds of Rogers High School. Gentile also found out that a student had been given a copy of the arbitrator’s award. Vukadinovich alleges that Gentile violated his First Amendment rights when Gentile ordered him to stay away from the school.[3] Vukadinovich argues that this violated his First Amendment rights because Gentile’s action restricted his right to speak publicly on matters of public concern.
We disagree. We note initially that “[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker’s activities.” Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 799-800, 105 S.Ct. 3439, 3447-3448, 87 L.Ed.2d 567 (1985). See also International Caucus of Labor Comms. v. City of Chicago, 816 F.2d 337, 340 (7th Cir. 1987). The Supreme Court has established that the limits, if any, the government can place on the expression of protected speech depends on the nature of the forum the speaker seeks to employ. Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Court has identified three types of fora: (1) the traditional public forum; (2) the public forum created by government designation; and (3) the nonpublic forum. Frisby, 487 U.S. at 479-80, 108 S.Ct. at 2499-2500; Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. Public schools are of the second type; they become public fora “only if school authorities have ‘by policy or by practice’ opened those facilities ‘for indiscriminate use by the general public’ or by some segment of the public such as student organizations.” Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (quoting Perry, 460 U.S. at 46 n. 7, 47, 103 S.Ct. at 955 n. 7, 956). See also May v. Evansville-Vanderburgh School Corp., 787 F.2d 1105, 1118 (7th Cir.1986). Where a school is not made a public forum, “[t]he public is not invited to use its facilities as a soapbox.” May, 787 F.2d at 1114. In fact, “[t]he public is not invited in, period.” Id.
Here, Vukadinovich fails to allege that any governmental body or authority made Rogers High School a public forum. Without so much as an allegation, Vukadinovich has failed to overcome the general rule that “[a] school is not presumed to be a public forum.” Id. at 1118. See also, e.g., Hazelwood, 484 U.S. at 267, 108 S.Ct. at 568; Perry, 460 U.S. at 46-47, 103 S.Ct. at 955-57. Once the Board discharged Vukadinovich, he became a member of the public. Members of the public have no constitutional right of access to public schools. Vukadinovich therefore had no constitutional right of access to Rogers High School. His claim that Gentile violated his First Amendment rights by restricting his access to Rogers High School fails.
B. Vukadinovich’s Due Process Claims
Next, Vukadinovich claims that the Board’s termination of his employment contract was conducted without due process of law as required by the Fourteenth Amendment. He also contends that the Board and certain of its members, stigmatized him in violation of due process.
(i) Procedural Due Process and the Termination of Vukadinovich’s Employment Contract
Vukadinovich argues that the procedures used by the Board did not comport with the *410 requirements of procedural due process for two reasons. First, he claims that the Constitution requires the Board to conduct a hearing both before and after it deprived him of his employment. Second, he alleges that the Board deprived him of procedural due process because the hearing was conducted with an unconstitutional risk of bias. Specifically, Vukadinovich argues that the hearing was constitutionally defective because the Board’s attorney, Marsha Volk, presided over the hearing. We address each of these claims in turn.
We note at the outset that “[t]he Due Process Clause ‘is not a guarantee against incorrect or ill-advised personnel decisions.’ ” Collins v. City of Harker Heights, — U.S. —, —, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992) (quoting Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976)).[4] Rather, due process requires only that we ask whether the government deprived a person of a constitutionally protected interest in life, liberty, or property, and, if so, whether the deprivation took place without all the process that was due. Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). The mere “deprivation by state action of a constitutionally protected interest in ‘life, liberty or property’ is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.” Id. (emphasis in original). See also, e.g., Carey v. Piphus, 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978) (“Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.”). Evaluating these claims therefore requires a two-step inquiry: we determine initially whether there was a deprivation of a protected interest and, if so, we then ascertain whether the procedures attendant upon the deprivation were constitutionally sufficient. Forbes v. Trigg, 976 F.2d 308 (7th Cir. 1992).
We need not focus on the initial inquiry — whether Vukadinovich had a constitutionally protected property interest in his employment with the M.C.A.S.; defendants concede the issue for purposes of their summary judgement motion. Appellees’ Brief at 31. We therefore consider only whether the procedures accompanying the cancellation of Vukadinovich’s employment contract were constitutionally adequate.
Generally, due process requires that before a government body deprives a person of a constitutionally protected interest in life, liberty, or property, it must conduct some type of hearing accompanied by notice and an opportunity to be heard. Zinermon, 494 U.S. at 127, 110 S.Ct. at 984; Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); Swanson v. Village of Lake in the Hills, 962 F.2d 602, 604 (7th Cir.1992). The extent and type of hearing requires a balancing of (1) the private interest in retaining employment; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the government’s interest, including the function involved and the burdens that additional procedures would entail. Loudermill, 470 U.S. at 542-43, 105 S.Ct. at 1493-94; Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); Swanson, 962 F.2d at 604.
Here, the Board provided Vukadinovich with notice approximately two months before the hearing. He was allowed to present evidence, call witnesses, cross-examine the school administration’s witnesses, and argue his case to the Board. Given the competing interests at stake, we do not believe that the Constitution entitled Vukadinovich to more process than this. Clearly, the Board provided a constitutionally adequate pre-deprivation hearing. It notified him of the date of the hearing and permitted him to participate fully during the course of the hearing. We conclude that any further pre-deprivation procedural *411 requirements would place too great a burden on the Board.
Vukadinovich’s claim that he was entitled to a post-deprivation hearing in addition to a pre-deprivation hearing is also without merit. His reliance on Loudermill and our decision in Swank v. Smart, 898 F.2d 1247 (7th Cir.), cert. denied, — U.S. —, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990), is misplaced. In Loudermill, the Court held, inter alia, that due process requirements were satisfied where the government provided a pre-termination opportunity to respond, coupled with post-termination procedures as provided by a state statute. 470 U.S. at 547-48, 105 S.Ct. at 1496-97. The Court did not hold that a post-termination hearing was constitutionally required in all cases however. Instead, it noted that “ ‘the root requirement’ of the Due Process Clause [is that] ‘an individual be given an opportunity for a hearing before he is deprived of any significant property interest.’ ” Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)) (emphasis in original).
Our decision in Swank is consistent with Loudermill. There, the plaintiff, a former police officer, sued the defendant city (and others) for alleged violations of his right to procedural due process. In Swank, the defendant city discharged the plaintiff after giving him notice and a brief probable cause hearing. The defendant did not, however, provide the plaintiff with a post-termination hearing. We remanded the case to the district court to determine whether the defendants offered plaintiff a further evidentiary hearing after the probable cause hearing defendants provided him before he was fired. We noted that
[a] public agency can fire an employee on the basis of notice (which there was here) and a probable-cause hearing provided it offers him a full hearing afterward. Only if there is no provision for a post-termination hearing must the pre-termi- ■ nation hearing provide all the procedural safeguards to which due process entitles a tenured public employee.
Swank, 898 F.2d at 1256 (citations omitted). Consistent with Swank’s admonition, the pre-deprivation hearing conducted by the Board in this case provided “all the procedural safeguards” required by due process. The hearing at issue here was not a mere probable-cause hearing, as described in Swank. Rather, it was more akin to a trial. Each side called witnesses and presented evidence, cross-examined opposing witnesses, argued their respective cases to the Board, and so on. Under the circumstances of this case, due process required no more.[5]
Next, Vukadinovich alleges that the hearing conducted by the Board contained an impermissible risk of bias because the Board's attorney, Marsha Volk, presided. This, Vukadinovich argues, violated the due process requirement of a fair trial before a fair tribunal. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). We disagree.
Vukadinovich has failed to overcome the presumption of honesty and integrity at *412 tributed to those who, like Volk, serve as adjudicators. Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); Swanson, 962 F.2d at 605; Panoz-zo v. Rhoads, 905 F.2d 135, 140 (7th Cir. 1990). Vukadinovich alleges only that Volk presided over the hearing and made rulings on the admissibility of evidence. He argues that she must have been biased because she was the Board’s attorney. We note, however, that Volk presided without objection from Vukadinovich, did not function as a prosecutor, and did not participate in the Board’s deliberations. Our decisions in Panozzo and Lamb v. Panhandle Community Unit Sch. Dist, 826 F.2d 526 (7th Cir.1987), demonstrate that Volk’s role in the hearing did not violate due process.
In Panozzo, we found no due process violation where a police chief prepared charges against the plaintiff, a former police officer, and presided at the plaintiff’s pre-termination hearing. 905 F.2d at 140. Similarly, in Lamb, a high school student who had been suspended alleged that the school board hearing at which his suspension was considered did not comport with due process. In Lamb, an attorney, the principal, and the superintendent performed dual roles. Specifically, plaintiff alleged that the attorney performed the role of prosecutor and the superintendent and principal testified as adverse witnesses. All three allegedly participated in the school board’s deliberations. 826 F.2d at 529 n. 3. We rejected plaintiff’s contention that this violated due process and instead held that “the combination of an advisory function with a hearing participant’s prose-cutorial or testimonial function does not create a per se facially unacceptable risk of bias.” Id. at 529.
In Withrow, the Supreme Court explained that performing such dual roles in an adjudicative setting does not, without more, violate due process. 421 U.S. at 54-58, 95 S.Ct. at 1468-70. In this case, Vuka-dinovich has failed to overcome the presumption, as expressed in Withrow, that Volk is a person “ ‘of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.’ ” 421 U.S. at 55, 95 S.Ct. at 1468 (quoting United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)); Panozzo, 905 F.2d at 140. In fact, Vukadinovich has failed even to show that Volk performed dual roles at the hearing. He merely complains that she was the Board’s attorney and therefore could not possibly have presided fairly over the hearing. As Withrow, Panozzo, and Lamb indicate, Vukadinovich must show much more to establish a constitutionally significant risk of bias. We therefore reject Vukadinovich’s claim that his discharge hearing was conducted with an unconstitutional risk of bias.[6]
(ii) Due Process: Stigma
Next, Vukadinovich contends that the Board, and certain of its members, violated his due process rights by publicly labeling him “immoral.” Appellant’s Brief at 38. The Board listed “immorality” as one of the reasons for their decision to fire him. Appellee’s Brief at 9. The Board reasoned that Vukadinovich’s overall behavior, criminal convictions, and subsequent incarceration merited such a label. Also, after the Board voted to discharge Vukadinovich, Board members Diane Dibkey and Allan Whitlow described him to local newspaper reporters as an “immoral” person. Finally, Superintendent Zeek made derogatory comments about Vukadinovich before a group of public school administrators. Vukadino-vich alleges that these actions stigmatized him so as to deprive him, without due process of law, of his liberty interest in his good name and damaged his prospects for future employment. We first examine the Board’s actions when it terminated Vukadi- *413 novich. Then, we consider the statements by Dibkey, Whitlow, and Zeek.
With respect to the action taken by the Board, we assume, arguendo, that Vukadinovich had a constitutionally protected liberty interest in his good name. See Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972); Munson v. Friske, 754 F.2d 683, 693 (7th Cir.1985). Nevertheless, we do not agree that he was deprived of this interest without due process of law. We repeat the Supreme Court’s admonition that “[w]here a person’s good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.” Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). See also Munson, 754 F.2d at 693. “Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented.” Constantineau, 400 U.S. at 437, 91 S.Ct. at 510.
Here, the Board gave Vukadinovich notice and an opportunity to be heard by conducting the March 5,1988 hearing. The Board pinned the “unsavory label” of “immorality” on Vukadinovich only after giving him notice and an opportunity to be heard at the hearing. Due process required no more. Id.
We also find no constitutional violation in the derogatory comments made by Dibkey, Whitlow, and Zeek. Although their comments might amount to defamation — a state law tort — they do not violate the Constitution. “[T]he mere defamation of an individual ... [is not] sufficient to invoke the guarantees of procedural due process absent accompanying loss of government employment.” Paul v. Davis, 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L. Ed.2d 405 (1976); Wroblewski v. City of Washburn, 965 F.2d 452, 456 (7th Cir. 1992). Defamation, without the threat of lost government employment is “not a ‘liberty’ interest protected by the Fourteenth Amendment,” though, by itself, it “is a tort actionable under the laws of most States.” Siegert v. Gilley, — U.S. —,—, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) (citing Paul, 424 U.S. at 708-09, 96 S.Ct. at 1164).
The comments Vukadinovich complains of occurred after the Board fired him. He therefore faced no threat of lost government employment when Dibkey and Whit-low labelled him “immoral” and when Zeek publicly criticized him. We conclude that the comments of Dibkey, Whitlow, and Zeek did not violate the Constitution.[7]
C. Vukadinovich’s Equal Protection Claim
Vukadinovich argues that the Board violated his rights under the Equal Protection Clause of the Fourteenth Amendment because the Board treated him differently than other teachers and staff who acted as he did.[8] Vukadinovich claims that he was “singled out” from other M. C.A.S. employees and that such treatment constituted “intentional discrimination.” Appellant’s Brief at 32. He contends that the Board did not penalize other M.C.A.S. employees who had alcohol-related problems. He also claims that the Board did not penalize certain other M.C.A.S. employees arrested by local police. Id. at 6-8. Vukadinovich argues that this treatment violated the equal protection guarantee that “ ‘all persons similarly circumstanced shall be treated alike.’ ” Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. *414 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). We do not agree.
Vukadinovich relies primarily on our decision in Ciechon v. City of Chicago, 686 F.2d 511 (7th Cir.1982). There, plaintiff had been discharged from her job as a permanent career service paramedic with the Chicago Fire Department. The City’s Personnel Board fired plaintiff after a patient of hers and her partner’s died. No action was taken against plaintiff’s identically situated partner (who was also a paramedic). But, the. defendant City fired the plaintiff. We held that the disciplinary proceedings brought against plaintiff violated equal protection (and due process) because “they represented an arbitrary, irrational decision to discriminate among the two paramedics ... who were equally responsible for the welfare of the patient on all ambulance runs.” Id. at 522. The record in Ciechon clearly demonstrated that the defendant City panicked due to pressure from the media and the decedent’s vengeance-seeking family. As a result, the defendant City used the plaintiff as a scapegoat to defuse the controversy surrounding the death.[9]
Although we concluded that defendants in Ciechon violated equal protection by treating identically situated individuals differently, we cautioned that “we have no intention of opening the floodgates to review all municipal personnel decisions.” Id. at 517. Our intervention was justified “only because these defendants purposely and invidiously chose one of two similarly situated employees for undeserved punishment and misused otherwise legitimate disciplinary procedures.” Id.
Vukadinovich has shown no such purposeful or invidious prejudice on the part of the Board. The most Vukadinovich alleges is that others, like himself, who had problems with alcohol or who had been arrested (under entirely different, unspecified circumstances), were not fired. Vukadinovich does not allege that the Board treated him any differently than anyone else who both had problems with alcohol and had been arrested. He only lists a few M.C.A.S. employees who either had problems with alcohol or had been arrested. This does not suffice for equal protection purposes. As Ciechon suggests, the Equal Protection Clause does not require that federal courts review the circumstances surrounding every personnel decision of public school boards. Vukadinovich’s case is distinguishable from Ciechon.
“Normally, we think of the Equal Protection Clause as forbidding the making of invidious classifications — classifications on the basis of such characteristics as race, religion, or gender.” Vukadinovich v. Bartels, 853 F.2d 1387, 1391 (7th Cir.1988). Typically, a plaintiff must show that the government classified him or her on the basis of some forbidden characteristic— such as race, religion, or gender. Id. at 1391-92. Vukadinovich has not shown, nor does the record reveal, any evidence of such animus motivating the Board’s decision. We agree with the district court that his equal protection claim is without merit.
D. Vukadinovich’s State Law Claims
Vukadinovich challenges the district court’s dismissal of his pendent state law claims for breach of contract, defamation, and slander. Appellant’s Brief at 49-50. The district court held, and we agree, that jurisdiction should not be exercised over the pendent state law claims because summary judgment in favor of the defendants was proper on all of Vukadinovich’s federal claims. Vukadinovich v. Board of School Trustees, 776 F.Supp. at 1334.
In United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the Supreme *415 Court held that pendent jurisdiction is a matter of discretion, not of plaintiffs right. It is well established that if federal claims are dismissed before trial, the federal district courts should generally dismiss the state law claims as well. Id. See also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 & n. 7, 108 S.Ct. 614, 619 & n. 7, 98 L.Ed.2d 720 (1988); Midwest Grinding Co. v. Spitz, 976 F.2d 1016 (7th Cir.1992); Landstrom v. Illinois Dep’t of Children and Family Servs., 892 F.2d 670 (7th Cir. 1990). We will reverse a district court’s dismissal of pendent state law claims only upon a showing that the district court abused its discretion. Landstrom, 892 F.2d at 679; Disher v. Information Resources, Inc., 873 F.2d 136, 140 (7th Cir. 1989). See also Huffman v. Hains, 865 F.2d 920, 923 (7th Cir. 1989) (describing a district court’s discretion over pendent state law claims as almost unreviewable).
The district court properly granted defendants’ motion for summary judgment on all federal counts. It was well within the district court’s discretion to dismiss the remaining state law claims. We hold that the district court did not abuse its discretion when it dismissed Vukadinovich’s state law claims.
III. CONCLUSION
We conclude that the other issues raised by Vukadinovich lack merit and do not warrant discussion.[10] For the foregoing reasons, the judgment of the district court is, in all respects, Affirmed.

. In June of 1988, after the Board canceled Vukadinovich's employment contract, an Indiana appellate court reversed the Jasper Circuit Court conviction because it found that the trial court had improperly denied Vukadinovich his right to a jury trial. Vukadinovich v. State, 529 N.E.2d 837 (Ind.App.1988).

. We note also that at least two members of the Board, Greg Hanke and Karen Janus, were not Board members in 1986 when Vukadinovich criticized the Board. Further, Hanke stated in his deposition that Vukadinovich’s 1986 comments played no role in either the Board’s deliberations or its decision to fire Vukadinovich.

. Additionally, Vukadinovich claims that Gentile attempted to force him to stop talking about the dispute with the media. This incident with Gentile took place almost a year after the Board terminated Vukadinovich’s employment. As a result, Gentile had no authority over Vukadino-vich to restrict his ability to speak about the case with the media. Therefore, Gentile could not have violated Vukadinovich’s First Amendment rights when he instructed Vukadinovich to stop talking about the case to the media.

. The Fourteenth Amendment Due Process Clause states: “No state ... shall deny to any person life, liberty, or property, without due process of law." U.S. Const, amend. XIV, § 1.

. Vukadinovich also cites Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to support his claim that the Due Process Clause entitled him to a post-deprivation hearing in addition to the pre-deprivation hearing conducted by the Board. In Parratt, the plaintiff, a prison inmate, claimed that prison officials negligently lost certain hobby materials that he ordered through the mail. The plaintiff asserted that this violated his constitutional right not to be denied property without due process of law. Id. at 529, 101 S.Ct. at 1909. The Court held that defendants had not denied plaintiff his due process rights because state tort remedies provided adequate post-deprivation procedures for plaintiffs loss. Id. at 544, 101 S.Ct. at 1917.
See also Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (partially overruling Parratt to the extent that Parratt held that mere lack of due care by a state official may unconstitutionally deprive an individual of life, liberty, or property under the Fourteenth Amendment).
Parratt is distinguishable from Vukadinovich’s case. In Parratt, there was no pre-deprivation hearing. Also, requiring a pre-deprivation hearing, as the Court noted, was impractical. Parratt, 451 U.S. at 539, 101 S.Ct. at 1914. Here, unlike Parratt, the Board provided Vukadinovich with extensive pre-deprivation procedures before it terminated his employment contract.

. Vukadinovich also claims that the Board fired him due to pressure from the media. However, Vukadinovich presents no evidence that the media affected either the hearing conducted by the Board or the Board’s ultimate decision to fire him. Vukadinovich merely points to a few newspaper articles that he alleges biased the Board against him. In fact, he admits that prior to the hearing he examined his file and found that it contained no newspaper articles. See Appellant’s Brief at 5. Clearly, he has failed to demonstrate any impermissible risk of bias.

. Vukadinovich also claims that the label of "immorality" attached to him by the Board and its members deprived him of a due process liberty interest in future employment. Even if such an interest is implicated, Vukadinovich’s claim fails because he points to no evidence that his prospects for future employment are diminished. See Munson, 754 F.2d at 693 (a liberty interest may be implicated where a government-created stigma forecloses an individual’s freedom to take advantage of other employment opportunities).

. The Fourteenth Amendment Equal Protection Clause states: “No State sháll ... deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1.

. In Ciechon, we noted that the defendant City considered the possible adverse publicity which affected the disciplinary process. 686 F.2d at 517. Other defects in the disciplinary process in Ciechon included: publicity generated by the decedent’s family; the City’s charges were not brought by the proper authorities; and the disciplinary hearing was conducted in violation of both the City’s Municipal Code and the Rules of the Personnel Board. Id. at 517, 522. Simply put, unlike the hearing conducted by the Board in this case, the hearing conducted in Ciechon amounted to a witch-hunt.

. Vukadinovich raises two other claims. First, he claims that the district court erred by allowing the defendants to raise new issues beyond their original summary judgment motion. Second, Vukadinovich claims that the district court erred when it dismissed his claim against Greg Hanke. We have considered both of these claims and conclude that they are meritless.