**Michael J. BAKALIS, Plaintiff–Appellee,**

v.

**Jenni GOLEMBESKI; Mark R. Stephens; Merrill Becker; James Durkin, Defendants–Appellants.**

No. 94–1093.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided Sept. 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 8, 1994.

William P. Rector, Alexis J. Rogoski (argued), Peterson & Ross, Chicago, IL, Theodore A. Boundas, Peterson & Ross, Springfield, IL, for plaintiff-appellee.

Gregory E. Rogus, Lori D. Isaacs, Martin A. Dolan, Segal, McCambridge, Singer & Mahoney, John B. Murphey (argued), Simone M. Boutet, Rosenthal, Murphey, Coblentz & Janega, Chicago, IL, for defendants-appellant.

Before POSNER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Michael J. Bakalis, Ph.D., brought this action pursuant to 42 U.S.C. § 1983 seeking damages from four individual members of the

Board of Trustees of Community College District No. 54 ("the Board") for terminating him without due process of law. The defendants moved for summary judgment on the merits and, alternatively, on the ground of qualified immunity. The district court denied the defendants' motion and defendants brought this appeal pursuant to 28 U.S.C. § 1291. We now affirm.

## I

## BACKGROUND

### A. *Facts*

Dr. Bakalis was employed as President and Chief Executive Officer of Triton College and was terminated two years prior to the completion of his contract. During his tenure, there were conflicts between Dr. Bakalis and members of the Board regarding the administration and management of Triton College. Specifically, Dr. Bakalis maintains that defendant Golembeski engaged in a public campaign to discredit him, which included writing letters to newspapers and making public statements that he was not qualified for the position he held. R. 25, Ex. 2 at 3. Furthermore, the Board members, according to Dr. Bakalis, interfered unreasonably in the day-to-day administration of the college.[1] Dr. Bakalis warned the Board and specifically the individually-named defendants that their actions threatened his ability to carry out his duties and responsibilities as President of Triton College. *Id.* at 4. He stated:

> I made known to the BOARD OF TRUSTEES and these individuals that their actions and conduct were improper under my employment contract, the BOARD OF

TRUSTEE[S'] own rules of ethics, and the Illinois Community College Board's and North Central Association's guidelines. Further, I made known to the BOARD OF TRUSTEES and these individuals that in my view their actions and conduct had an improper purpose and were contrary to the best interests of TRITON COLLEGE.

*Id.* As a result of these conflicts, defendant James Durkin requested that Dr. Bakalis resign as Triton College President and advised Dr. Bakalis that, in the view of some of the Board members, he was not carrying out the duties of his office in an effective manner. At a closed session of the Board, another Board member, Mark Stephens, stated that the Board could offer Dr. Bakalis nine months' severance pay if he would resign.

At a special meeting, the Board voted to retain counsel who would investigate and recommend to the Board whether there was cause to terminate Dr. Bakalis' employment as President of Triton College. Counsel concluded that there was sufficient evidence to terminate Dr. Bakalis for cause. Therefore, on June 23, 1992, the Board enacted a resolution which provided for the Board "to seek to terminate Dr. Bakalis" pursuant to paragraph 10(B) of his employment contract.[2] The reasons for his termination were listed in a document dated June 23, 1992, entitled "Notice of the Reasons for Seeking the Dismissal of Dr. Michael J. Bakalis from his Position as President of Triton College"; Dr. Bakalis received a copy the following day. On the day these resolutions were adopted, the Board also adopted a Resolution which provided for procedures to terminate Dr. Bakalis. According to these procedures Dr.

---

1. Dr. Bakalis lists, by way of example, several instances of interference, including: defendants Stephens and Durkin unilaterally rewriting the college mid-manager policy manuals; defendant Golembeski striking personnel recommendations without submission to the entire Board; the Board, and specifically defendants Stephens and Golembeski, harassing Dr. Bakalis regarding the hiring of a special counsel and subsequently threatening not to pay the counsel properly hired. R.25, Ex. 2 at 4–5.

2. Paragraph 10(B) of his employment contract provided that Dr. Bakalis could be discharged by the Board for cause and provided:

> If the Board seeks to terminate Dr. Bakalis for cause it shall first provide Dr. Bakalis with full notice of the reasons for his termination and an opportunity to respond to those reasons at a hearing. Such hearing shall be before the Board or, if the Board so determines, before a committee of the Board. If the hearing is conducted by the Committee, the committee will report the findings to the full Board. The full Board will then accept, reject or amend the committee's recommendation as to whether just cause exists to terminate this Agreement. If the full Board then determines to terminate this Agreement the Board shall specify the effective date of termination.

Bakalis was allowed a pre-termination and a post-termination hearing. The latter would be conducted by a committee of three Board members appointed by the Chair and would be convened at Dr. Bakalis' request in the event of his termination. Ms. Golembeski was the Chair of the Board during this time.

On July 7, 1992, prior to voting to terminate Dr. Bakalis, the Board held a hearing which Dr. Bakalis attended with his attorney. During the hearing, Dr. Bakalis was given the opportunity to respond to the Notice of Reasons. After this meeting, the Board voted to dismiss Dr. Bakalis by a vote of 4–3; the four members of the Board voting to dismiss Dr. Bakalis are the individually-named defendants.

Dr. Bakalis then requested a post-termination hearing. Three members of the Board, two of whom voted for Dr. Bakalis' dismissal, were appointed to conduct the hearing. The hearing was to be a full evidentiary hearing. During one of the post-termination hearing sessions, Dr. Bakalis, through his counsel, announced that he was withdrawing from the hearing. After this incident, the hearing committee met twice; Dr. Bakalis did not appear on either occasion. The Committee then notified Dr. Bakalis that his request for a post-termination hearing would be considered withdrawn unless it was notified within fourteen days. The Committee received no notice and thus recommended to the full Board that his termination be considered final.

### B. District Court Proceedings

In this action, brought pursuant to 42 U.S.C. § 1983, Dr. Bakalis alleged that the Board had violated his right to due process by terminating him without a fair hearing.[3] The members of the Board moved for summary judgment on the federal cause of action on the grounds that, as a matter of law, they had met the requirements of due process, and alternatively that they were entitled to

qualified immunity. The district court denied this motion. It stated that "[p]laintiff cannot be deprived of his property right in continued employment without due process of law, which includes notice of the charges against him and an opportunity to respond to them before an impartial tribunal." R. 28 at 6–7. Additionally, it found that there were questions of material fact regarding the Board members' impartiality. *Id.* at 7. Consequently, it concluded, summary judgment on the merits was inappropriate.

Addressing the Board members' qualified immunity argument, the district court followed the traditional qualified immunity standard set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court determined that, at the time the acts in question took place, "it was clearly established by the decisions of both the Supreme Court and the Seventh Circuit that due process required that plaintiff's termination hearing be heard by an impartial tribunal." R. 28 at 9. The court then determined that "a genuine issue of fact [existed] regarding whether the individual defendants knew or should have known that due process required a fair and impartial tribunal, especially in light of plaintiff's and plaintiff's counsel's repeated attempts to inform the individual defendants of this requirement at plaintiff's termination hearing." *Id.* at 10. For this reason, concluded the district court, the defendants were not entitled to qualified immunity. The members of the Board now appeal.

## II

## ANALYSIS

■ In this appeal, the only issue properly before the court is whether the district court erred in its determination that the defendants were not entitled to the defense of qualified immunity. The district court addressed this issue only briefly.[4] However,

---

3. Dr. Bakalis also alleged violations of state law; specifically, he charged the defendants with breach of the covenant of good faith and fair dealing, with tortious interference with contractual relations, and with defamation. R.1.

4. Dr. Bakalis contends, both in his brief and in his separate motion to dismiss, that this court does not have jurisdiction over this appeal because it does not meet the separability requirement of the collateral order doctrine. Essentially, Dr. Bakalis argues that the law is clear with

when its opinion, including that portion that deals with the denial of summary judgment on the merits, is read as a whole, there are sufficient conclusions of law to permit us to proceed without remanding to the district court. In any case, the issue before us— whether the defendants are entitled to the defense of qualified immunity—is a matter of law and we may affirm the judgment of the district court on any ground that is fairly supported by the record.

■ The members of the Board allege several errors in the district court's decision. First, they maintain that the district court applied the wrong standard in determining the qualified immunity question. The district court, argue the defendants, conducted the qualified immunity inquiry at too general a level; it should have asked "whether, under the specific facts involved in this case, it should have been apparent to the individual defendants that the action they took" deprived Dr. Bakalis of his right to an impartial decisionmaker. Appellants' Br. at 17. Second, they contend that the procedures used to terminate Dr. Bakalis did not clearly violate any right of Dr. Bakalis to an impartial decisionmaker.[5] Finally, the individual defendants contend that, under the existing law at the time, it was not clear that their prior disputes with Dr. Bakalis rendered them impartial. We review the denial of qualified immunity de novo. *Rakovich v. Wade,* 850 F.2d 1180, 1204 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

■ The standard for a grant of qualified immunity is well established: "[G]overnmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitz-*

---

regard to the requirement of an impartial tribunal and that the only dispute between the parties is a factual one: whether the Board was a biased tribunal. Dr. Bakalis states:

> The Individual Defendants' jurisdictional statement does not argue there was legal uncertainty respecting the requirement of an impartial tribunal. Indeed, the argument cannot be made. The Individual Defendants cannot reasonably suggest [that] going through motions of pre-termination and post-termination hearings was sufficient to satisfy due process if in fact they had prejudged the case. The District Court found Bakalis satisfied his burden of offering the minimum quantum of proof to defeat the initial motion for summary judgment.

Appellee's Motion to Dismiss Appeal at 3 (citations omitted). Because the law is clear, he maintains, an interlocutory appeal is inappropriate. *See Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir.1991) ("When rules of law clearly establish public officials' duty, the immunity defense is unavailable. So, too, the interlocutory appeal to vindicate the right not to be tried is unavailable when there is no legal uncertainty; there is no separate 'right not to be tried' on the question whether the defendants did the deeds alleged; that is *precisely* the question for trial."), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). However, the defendants claim that there is uncertainty in the law. They argue: "Under the existing law at the time of Dr. Bakalis's termination, it would not have been apparent to the Individual Defendants that because of their disputes with Dr. Bakalis over the management and operation of Triton College their par-

ticipation in the proceedings relating to Dr. Bakalis's termination would deprive Dr. Bakalis of an impartial decision-maker." Appellants' Br. at 26. The question which we must address is whether the constitutional right—in the case before us the right to have an employment termination determined by an impartial tribunal—was defined in a sufficiently detailed manner to apprise the defendants that their actions were unconstitutional. Whether a constitutional right is clearly established in a sufficiently particularized manner is a question of law properly before this court. *See Sherman v. Four County Counseling Ctr.,* 987 F.2d 397, 401 (7th Cir.1993).

5. The Board maintains that the procedures met the standards set forth in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), and were therefore constitutional. However, *Loudermill* does nothing to answer the contentions of Dr. Bakalis. In *Loudermill,* the Supreme Court outlined the procedural requirements for terminating a public employee. A pre-termination hearing, held the Court, need not resolve definitively all issues surrounding the discharge. When a complete post-termination hearing is provided, the pre-termination hearing need only "be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. at 1495. However, Dr. Bakalis does not take issue with the procedures per se—only the personal bias and partiality of those participating in the procedures.

*gerald,* 457 U.S. at 818, 102 S.Ct. at 2738. However, a plaintiff may not escape the doctrine of qualified immunity by alleging violation of a clearly established, but very broad, constitutional right.

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Our own caselaw has elaborated on this need for sufficient specificity. For instance, in *Colaizzi v. Walker,* 812 F.2d 304, 307–08 (7th Cir. 1987), we explained:

> [The *Harlow* qualified immunity] test would have little bite if a right "clearly established" *at any level of generality* could survive it. "The words 'clearly established . . . constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."
>
> . . . .
>
> Our conclusion is that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.

*Id.* (quoting *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986)). If the protection afforded government officials were not cast in such terms, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson,* 483 U.S. at 639,

107 S.Ct. at 3039. However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039. As the court said in *Rakovich:*

> We caution that just as the right allegedly violated should not be characterized or defined so generally that invariably guiding law is found to show the right was clearly established, the right should not be defined so intricately that invariably guiding law never can be found. A practical appraisal shows that the process of defining the factual situations from disparate types of cases results in some flexibility within the limits of the objective inquiry and within the limits of *Anderson* and its progeny. Courts are able to carefully consider the proper characterization. It need only be kept in mind that the characterization used must be sufficiently particularized to enable the district court to determine whether the officers were *on notice* that their actions violated clearly established law.

850 F.2d at 1211. We look therefore to the law in existence at the time to evaluate whether the actions taken by the defendants violated Dr. Bakalis' right to due process of law.

At the heart of due process is the right to a fair hearing conducted by an impartial tribunal. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (citations omitted). At issue in *Withrow* were the actions of a medical examining Board which first had conducted an investigative hearing to determine whether a doctor had engaged in certain proscribed acts. After this hearing, the same Board had conducted a contested hearing to determine whether the doctor's license to practice medicine should have been revoked. The Court held:

> The contention that the combination of investigative and adjudicative functions nec-

essarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is adequately implemented.

*Id.* The Court distinguished the situation before it from situations in which actual bias may arise:

> In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.

*Id.*

The Supreme Court also has spoken to the requirement of an impartial tribunal in *Hortonville Joint School District # 1 v. Hortonville Education Association,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976). In *Hortonville,* the Supreme Court determined that a board of education could constitutionally adjudicate the fate of teachers' employment when it had participated in contract negotiations with those teachers. *Id.* at 492, 96 S.Ct. at 2314. The Court characterized the issue accordingly: "The sole issue in this case is whether the Due Process Clause of the Fourteenth Amendment prohibits this School Board from making the decision to dismiss teachers admittedly engaged in a strike and persistently refusing to return to their duties." *Id.* at 488, 96 S.Ct. at 2312. The Court held that due process did not foreclose the Board from making this decision. However, the Court made clear that it

was resting its decision on the factual determinations of the Wisconsin courts. The state courts had not found

> that the Board members had the kind of personal or financial stake in the decision that might create a conflict of interest, and there is nothing in the record to support charges of personal animosity. The Wisconsin Supreme Court was careful "not to suggest ... that the board members were anything but dedicated public servants, trying to provide the district with quality education ... within its limited budget."

*Id.* at 491–92, 96 S.Ct. at 2314 (citations and footnotes omitted).[6]

The situations presented in *Withrow* and in *Hortonville* stand in stark contrast to the type of personal bias that requires recusal of the adjudicator as a matter of due process. For instance, in *Taylor v. Hayes,* 418 U.S. 488, 501–02, 94 S.Ct. 2697, 2704–05, 41 L.Ed.2d 897 (1974), the Supreme Court held that it violated the Due Process Clause for a judge who had "become embroiled in a running controversy" throughout the trial to preside over contempt proceedings based on that conduct. The Court reached the same conclusion in *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). There the Court noted that "a judge, vilified as was this ... judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." *Id.* at 465, 91 S.Ct. at 505. On the other hand, a "judge cannot be driven out of a case." *Id.* at 463, 91 S.Ct. at 504. "We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Ungar v. Sarafite,* 376 U.S. 575, 584, 84 S.Ct. 841, 847, 11 L.Ed.2d 921 (1964).

This court also has had the opportunity to speak to the requirements of an impartial tribunal when a public employee is terminated. Most recently, in *Swanson v. Village of Lake in the Hills,* 962 F.2d 602 (7th Cir. 1992), a dismissed police officer alleged that

6. The question at issue in our case—the motivations and potential bias of the Board members—had already been adjudicated in the Wisconsin courts in *Hortonville* and was not before the Supreme Court.

the police commissioner could not judge fairly his disciplinary action because he had appealed to a state court a prior disciplinary ruling. This court held that the appeal of a prior determination alone was not sufficient to overcome the "'presumption of honesty and integrity'" afforded administrative decisionmaking. *Id.* at 605 (citations omitted). Similarly, in *Panozzo v. Rhoads*, 905 F.2d 135 (7th Cir.1990), we reiterated that partiality does not arise simply because a decisionmaker, in that case the chief of police, is involved in the investigation and adjudication of disputes. We stated:

> [P]laintiff must overcome the presumption that the decision-maker is "[a person] of conscience and intellectual discipline and capable of judging a particular controversy fairly on the basis of its own circumstances." Panozzo has not offered any evidence that Chief Rhoads failed to meet this standard; therefore, the argument must fail.

*Id.* at 140 (quoting *Withrow v. Larkin*, 421 U.S. at 55, 95 S.Ct. at 1468–69). Finally, in *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569 (7th Cir.1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), a former president of a public junior college brought an action against the Board for wrongful termination. This court held that the defendants had violated the president's rights when they gave him a hearing only after terminating and replacing him.

> There can be no real dispute that before the special session of the board on July 23, 1970, when plaintiff was to be afforded a hearing, the board had already decided to terminate him, and had in fact made a commitment to another person to hire that person as interim president. The board having prejudged the matter of plaintiff's termination ... and being no longer therefore "a tribunal possessing apparent impartiality," ... plaintiff did not waive his right to a hearing by absenting himself from that meeting.

*Id.* at 575–76 (citations omitted).

Our colleagues in the Tenth Circuit have confronted a situation presenting the due process issue in a scenario very similar to the one before us. In *Staton v. Mayes*, 552 F.2d 908 (10th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977), that court determined that the plaintiff, a former school superintendent, had been deprived of due process when his contract was terminated by the school board. Three of the five-member board had made public or private statements prior to the termination hearing that the plaintiff had to be removed. The Tenth Circuit distinguished its case from that presented in *Hortonville* or in *Withrow:*

> These were not mere statements on a policy issue related to the dispute, leaving the decision maker capable of judging a particular controversy fairly on the basis of its own circumstances. *Hortonville, supra*, 426 U.S. at 492–93, 96 S.Ct. at 2314. Nor was this simply a case of the instigation of charges and a statement of them during an investigatory phase by the body that will later decide the merits of the charges. *E.g., Withrow v. Larkin*, 421 U.S. 35, 52–53, 95 S.Ct. 1456, 1467–68, 43 L.Ed.2d 712.

> Instead this case involves statements on the merits by those who must make factual determinations on contested fact issues of alleged incompetence and willful neglect of duty, where the fact finding is critical.... And the ruling here concerned factual decisions on alleged incompetence and willful neglect of duty—issues which were both hotly contested and of critical effect on the liberty and property interests of the plaintiff.

> . . . .

> We are convinced that these established circumstances left no room for a determination that there was a decision by a fair tribunal, with the appearance of fairness, in view of the totality of these circumstances.

*Id.* at 914–15 (citations omitted).[7]

Thus, according to Supreme Court and Court of Appeals precedent, due process

---

**7.** The defendants maintain that the caselaw on which the district court relied is, as a matter of law, insufficient to apprise them that they were violating Dr. Bakalis' constitutional rights.

requires a hearing by an impartial tribunal. Partiality will not be presumed simply because the same tribunal investigates and adjudicates the employment decision. Furthermore, there is a presumption that those making decisions affecting the public are doing so in the public interest. However, bias and partiality become very real problems if the tribunal has been the target of criticism or abuse from those coming before it. Certainly, a body that has prejudged the outcome cannot render a decision that comports with due process.

█ We now turn to the case before us. As the above discussion of the caselaw establishes, we think it was clear that at the time of the events in question a person who had prejudged the case could not sit in judgment of Dr. Bakalis on the issue of his continuance in office. The district court was of the view that the record raised a genuine issue of triable fact as to whether certain members of the Board had prejudged Dr. Bakalis and, consequently, had not given him a fair and impartial hearing. When read in a light most favorable to Dr. Bakalis, the record reflects the sort of "running controversy" between the Board members and Dr. Bakalis that precluded impartial adjudication. Dr. Bakalis had confronted the individual members of the Board concerning their actions. He had told them that their conduct not only was harming the college, but also was unethical. Thus, the members of the Board had been the subject of the sort of personal criticism that, according to *Withrow*, increased

the possibility of bias. The individual Board members had not been passive recipients of this indictment. Some had asked Dr. Bakalis to resign prior to the hearing in which they were to determine whether Dr. Bakalis should be dismissed. At least one Board member also had made public statements questioning Dr. Bakalis' qualifications to hold the position of President. Thus, there is evidence that members of the Board had prejudged Dr. Bakalis' fate prior to the hearing; this prejudgment, if it existed, rendered the hearing violative of due process.

Contrary to the defendants' contentions, Dr. Bakalis' allegations do not mirror those of the plaintiffs in *Swanson* or *Rhoads*. In those cases, no evidence had been presented that the decisionmakers had prejudged the case. We believe that the caselaw is clear that the prejudgment alleged by Dr. Bakalis in this summary judgment record would have precluded the Board from fairly adjudicating Dr. Bakalis' employment and that a reasonable Board member would have understood that such prejudgment precluded sitting in judgment of the case.[8] Consequently, on the record before us, we cannot say that the Board members are entitled to qualified immunity. If credited by a trier of fact, the evidence as presented by the plaintiff would justify a conclusion that the Board members had prejudged the matter and should have known that they could not act as impartial adjudicators of Dr. Bakalis.

█ Qualified immunity is an individual defense available to each individual defen-

However, our decision does not rely only upon the caselaw cited by the district court, but on Supreme Court and circuit precedent. Furthermore, "the rulings in other circuits are instructive on what the law is as to constitutionally protected rights." *Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir.1992).

8. The Board members argue that these allegations are inadequate, as a matter of law, to create a genuine issue of material fact precluding summary judgment because they are based on a verified complaint. This court, the defendants maintain, has rejected a verified complaint, made on personal knowledge, as sufficient to preclude summary judgment. *See Price v. Rochford*, 947 F.2d 829 (7th Cir.1991). We find this argument unpersuasive for three reasons. First,

this argument was made only in a footnote in the opening brief and was not developed fully until the reply brief. Consequently, this argument is deemed waived. *See Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1035 (7th Cir.1990). Second, with regard to the statement challenged in the opening brief, it is not at all clear to us that the statements of defendant Golembeski would be considered hearsay and therefore inadmissible. The statements are not offered for the truth of the matter asserted, i.e., Dr. Bakalis' qualifications; instead, they are offered to show the motivation of the speaker with regard to the actions taken. Finally, even if this statement were not admissible, there is sufficient evidence of bias in the portions of Dr. Bakalis' affidavit on which he clearly is competent to testify.

dant in his individual capacity.[9] At this stage of the proceeding and on the record before us, we must conclude that there is a genuine issue of triable fact with respect to each of the named individual defendants that precludes the defense of qualified immunity. We must note, however, that the evidence with respect to each defendant is quite different and further proceedings may well establish that the same decision ought not to be rendered with respect to each. We only hold that, at this point, the record contains a genuine issue of triable fact that precludes summary judgment on the ground of qualified immunity. We caution the district court that, in further proceedings, including any motion for judgment as a matter of law filed by any party,[10] individual liability must be predicated on a finding that the individual member had in fact prejudged the case.[11]

### Conclusion

For the foregoing reasons, the judgment of the district court denying the motion to dismiss on the ground of qualified immunity is affirmed.

AFFIRMED.

---

9. *See Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 747 (10th Cir.1991) (holding that liability for acting as a biased factfinder must be assessed on an individual basis).

10. *See Armco Steel Corp. v. Realty Inv. Co.*, 273 F.2d 483, 484–85 (8th Cir.1960) (noting that denial of summary judgment does not preclude reevaluation on a motion for judgment as a matter of law when "both parties have had an opportunity to adduce all relevant, available evidence so that the trial court is no longer uncertain as to the circumstances of the case"); *accord Voutour v. Vitale*, 761 F.2d 812, 822 (1st Cir.1985) (per curiam) (applying the principle in a civil rights context), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *see also* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2532 (1971) (discussing the principle and quoting *Armco Steel Corp.*, 273 F.2d at 485).

11. The board members contend that, even if the law was clearly established that their actions rendered them biased, the rule of necessity required them to adjudicate Dr. Bakalis' employment. They claim that they are the only body empowered under Illinois law to decide the fate of Dr. Bakalis. Consequently, even if biased, the Board claims that they had a statutory obligation to make the employment determination. In the district court, this argument was made only with respect to the merits of the action and not with respect to the defense of qualified immunity. Indeed, it was not until the reply brief in this court that the defendants suggested that the choice between recusal on account of bias and the need to adjudicate the matter presented a legal ambiguity that afforded them the defense of qualified immunity; consequently, we have no occasion to address this argument on the merits. *Cf. Egert*, 900 F.2d at 1035 (stating that arguments not raised until the reply brief are deemed waived). In any event, we do not believe that the record before us would support a defense based on the rule of necessity even if the matter were properly before us. It appears that, under the law of Illinois, an administrative body can invoke the rule of necessity when, as a corporate body, it has a conflict of interest *and* the nontransferable duty to adjudicate the matter at hand. *See E & E Hauling, Inc. v. Pollution Control Bd.*, 116 Ill.App.3d 586, 71 Ill.Dec. 587, 451 N.E.2d 555, 567–68 (1983), *aff'd on other grounds*, 107 Ill.2d 33, 89 Ill.Dec. 821, 481 N.E.2d 664 (1985). Here, however, each member defendant is accused of a personal bias and, until a sufficient number of members of the Board recused themselves, there was no occasion to invoke the rule of necessity. The rule does not become applicable until there are sufficient recusals to render the body without a quorum. *See Board of Educ. of Community Consol. High Sch. Dist. No. 230 v. Illinois Educ. Labor Relations Bd.*, 165 Ill.App.3d 41, 116 Ill.Dec. 91, 518 N.E.2d 713, 717 (1987).